UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMIE GOMEZ,<br><br>        Petitioner,<br><br>   v.<br><br>SCOTT KERNANA,<br><br>        Respondent. | Case No. 1:18-cv-01425-NONE-JDP<br><br>FINDINGS AND RECOMMENDATIONS TO DENY PETITION FOR A WRIT OF HABEAS CORPUS AND TO DECLINE TO ISSUE A CERTIFICATE OF APPEALABILITY<br><br>OBJECTIONS DUE IN THIRTY DAYS<br><br>ECF No. 1<br><br>ORDER DENYING PETITIONER'S MOTIONS FOR AN EVIDENTIARY HEARING AND APPOINTMENT OF COUNSEL<br><br>ECF No. 1 |

    Petitioner Jamie Gomez, a state prisoner proceeding without counsel, seeks a writ of habeas corpus under 28 U.S.C. § 2254. ECF No. 1. Petitioner claims that the trial court violated his Sixth Amendment right to confrontation. ECF No. 1 at 5. Respondent argues that the petition is untimely, or, in the alternative, that the state court's rejection of petitioner's claim was not unreasonable.[1] ECF No. 20. For the reasons set forth below, we recommend that the court deny the petition and decline to issue a certificate of appealability.

---

[1] Respondent unsuccessfully moved to dismiss the petition as untimely, ECF No. 11, and renewed this argument in his answer to the petition, ECF No. 20. For the reasons stated in our findings and recommendations to deny respondent's motion to dismiss, we decline to address the

1

**I.     Background**

A Kern County jury convicted petitioner of false imprisonment, carjacking, making a criminal threat, second degree robbery, reckless evasion of a peace officer, and resisting a peace officer.[2] *See People v. Gomez*, F070785, 2016 Cal. App. Unpub. LEXIS 9160, at *1 (Dec. 21, 2016); ECF No. 12-2 at 2. Petitioner was sentenced to 22 years and eight months in state prison. *Id*. We set forth below the pertinent facts of the underlying offenses, as summarized by the California Court of Appeal. A presumption of correctness applies to these facts. *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015).

**I.     Prosecution's Case**

**A.     The 911 calls**

> On February 17, 2014, three 911 calls were made in Bakersfield, California. The three calls were played for the jury. The first call occurred at approximately 5:42 p.m. and petitioner's sister, Juanita Gomez, reported that petitioner "took off" in her car, a blue 1999 Lexus. She gave him the keys after he threatened to kill her with a gun. She indicated petitioner was on drugs and he had put a gun to her head. She could be heard crying. The call ended abruptly.
>
> During the second call, Juanita said she had "just called and reported my brother taking my car." She had been held hostage with a gun "for a little while" and she asked if officers could come to her house. She said her sister, Monique, had made the first 911 call, but Juanita confirmed she was the victim.[3] She said [petitioner] had been demanding money and had her hostage since 2:00 p.m. "just rolling around." She took him to a friend's house. Juanita was heard crying during the call and she expressed concern that [petitioner] would shoot her if he saw police officers at her house. She said she was "scared" of [petitioner] and "traumatized by him."
>
> During the final call, Angel asked the 911 operator to send someone to Juanita's location because "[h]e was holding her at gunpoint." Angel indicated [petitioner] had just left driving a blue 1999 Lexus. She said [petitioner] brought Juanita to her (Angel's) house at gunpoint. According to Angel, [petitioner] made her give him some money because he wanted to buy bullets. Angel understood that [petitioner] "jumped" into Juanita's car at a stop sign as she drove home from work. "[H]e started holding her at gunpoint and making her drive around to get money so he could go buy more

---

timeliness of the petition here. *See* ECF No. 13.

[2] The jury was unable to reach an agreement on alleged firearm enhancements and a mistrial was declared on those enhancements.

[3] The jury learned that Monique is Angel Monique Franco. Angel and Juanita are friends.

2

bullets for his gun." They called Angel and then drove to her house.

**B.    A deputy speaks with Juanita**

Law enforcement responded to Juanita's location. A sheriff's deputy spoke with Juanita at about 6:10 p.m. that night. She appeared distressed. She was breathing heavily and crying.

Juanita informed the deputy about the events that day, which were generally consistent with the details from the 911 calls. According to the deputy, who relayed these statements to the jury, Juanita was driving home from work at about 3:15 p.m. in her blue 1999 Lexus when she saw [petitioner] walking towards her residence. [Petitioner] was not wanted at her house around her kids because he is "a known drug user." She pulled over next to him and rolled down the passenger window to speak with him, but he opened the door and sat down in the front seat. Based on his request, she drove him to a cemetery to visit a deceased acquaintance, and then she drove him to another person's house in Bakersfield. At that location, [petitioner] refused to exit her Lexus. He pulled out a small handgun from his waistband and pointed it at her stomach. He said it was their day to die and she was "not going anywhere." Juanita informed the deputy that she believed [petitioner] was going to kill her, and she feared for her life.

[Petitioner] produced a second handgun and demanded Juanita's cellular phone so he could call family members for money. [Petitioner] called Angel, asking her for money for ammunition. Juanita drove him to Angel's house. While driving, [petitioner] rubbed the barrel of the handgun against Juanita's face. He said everyone "was going down" with him if he did not get more money.

When they arrived, Angel came out of her residence and into the driveway. [Petitioner] told Juanita to stay in the car. [Petitioner] exited the car and he asked Angel for money. Juanita believed Angel gave [petitioner] $40. Juanita took the opportunity to flee from the car, and she ran towards Angel's front door. [Petitioner], however, ran between her and the door and demanded all of her money. She said the Lexus was her only remaining asset because she had already given him all of her money. [Petitioner] "ripped the keys from her hand."

The deputy spoke with Juanita for about 10 minutes. Juanita informed the deputy she would never appear in court to testify about the case because she had family members who were in prison. If she testified, "she would die." She refused to look at a

3

photograph of her brother to possibly identify him as the suspect in the case.[4]

### C. A deputy speaks with Angel

Following the 911 calls, a sheriff's deputy was dispatched to Angel's location to obtain her statements. Angel spoke with the deputy about the events that day, which were generally consistent with the details from the 911 calls.

According to the deputy, who relayed these statements to the jury, Angel received a phone call from Juanita's cellular telephone about 5:30 p.m. [Petitioner] was on the line, and he said, "I need money for bullets." Angel said she had to leave for work, and [petitioner] replied, "If I don't get the money, then Juanita's dead." Angel told [petitioner] to meet her at her house. [Petitioner] hung up the phone. Approximately five minutes later she exited her residence and saw a blue Lexus approaching. Juanita was driving and [petitioner] was in the passenger seat. They parked in front of her house and she approached the driver's side. Angel had a "clear view of" two firearms inside the vehicle, and [petitioner] was pointing one towards Juanita's stomach. The other weapon was laying on [petitioner's] lap.

Angel asked [petitioner] what he was doing, and he said, "I have nothing to live for. My parents are dead, my best friend's dead. Everybody around me is dying." He said Juanita was "going down" with him when Angel asked him to leave Juanita there.

Juanita placed the vehicle in reverse. [Petitioner] grabbed the steering wheel, placed the firearm to her head and said, "I'm not playing around." He exited the vehicle and placed both firearms in his waistband. He approached Angel and demanded money. She gave him $40. Juanita exited the vehicle with the keys and began crying hysterically. [Petitioner] took the keys from her and drove away in the Lexus. Angel and Juanita went inside the residence and Angel's daughter called 911.

### D. A deputy speaks with Angel's daughter

A deputy interviewed Angel's daughter, Savannah Franco, on the night of the incident. Savannah's statements were generally consistent with the details from the 911 calls. According to the deputy, who relayed these statements to the jury, Savannah was home with her mother. Savannah saw both Juanita and [petitioner] at their house that day. Angel received a phone call from Juanita's phone number but [petitioner] was on the phone. Angel told Savannah to "take all the children inside and lock the doors because [petitioner] was on his way to the residence" and he had taken

---

[4] Juanita was subpoenaed to appear as a witness at trial. However, she failed to appear and a bench warrant was issued for her arrest. The arrest warrant was still outstanding when the prosecution rested its case.

4

Juanita hostage. Savannah made sure the kids were inside and she locked the doors to the residence.

Savannah looked out a window and saw Juanita's blue Lexus parked in front of the residence. Juanita was in the driver's seat and [petitioner] was in the passenger's seat. The passenger window was rolled down. Angel had planned on giving [petitioner] money, and Angel approached the passenger's side door. Savannah could hear [petitioner] "screaming and she heard him mention a firearm." After looking inside the vehicle, Angel started walking backward into the driveway. Savannah was scared for her mother so she went outside to the driveway. [Petitioner] exited the vehicle, approached Angel, and screamed at her for money.

While this was going on, Juanita exited the vehicle and ran towards the residence. [Petitioner] ran between Juanita and the residence's front door. Angel gave [petitioner] $40, and she asked [petitioner] to leave. He went to the front door of the residence and turned the knob, but the door was locked. He took the keys from Juanita and he drove the Lexus away.

### E.  [Petitioner] is apprehended

Around the time the deputy was speaking with Juanita, highway patrol officers in the area located [petitioner] in the Lexus, and he led officers on an unsafe, high-speed pursuit. He crashed the Lexus in an orange orchard and he fled on foot from the vehicle. He was located in a tree and dragged down to the ground by a K-9 after he ignored repeated commands to come down voluntarily. He was searched. A cellular phone and $40 were found on him. No firearms were located, but a bag of ammunition was found in the vehicle. The cellular phone was later returned to Juanita, who identified it as hers.

### F.  Angel's trial testimony

At trial, Angel told the jury she was very close friends with Juanita. Angel was home on the night of the incident with her daughter, Savannah. Angel told the jury she could not recall if she received a phone call that night from Juanita's cell phone or if she told anybody about receiving such a call. She told the jury that she spoke with law enforcement that day about an incident that occurred, but she could not recall what she said. When asked if she would have made honest statements to law enforcement that day, she said her honesty depended on the situation. She denied having any recollection or memory of her statements to law enforcement that night. She admitted that she remembered Juanita's vehicle parking in front of her house but claimed she did not approach it and she did not remember talking to law enforcement about the car. She claimed an inability to recall any previous statements she made about [petitioner's] actions with guns, his demands for money, or holding Juanita hostage.

Angel admitted she talked to a 911 operator after [petitioner] left her house, but she could not remember what she said. She could

not recall if she asked the 911 operator to send help, if she said she gave [petitioner] money, or if she said [petitioner] held Juanita at gunpoint. She told the jury she could not remember if she gave [petitioner] any money.

A portion of her 911 call was played, and Angel admitted it was her voice. The entirety of her 911 call was played for the jury. Angel denied that the 911 call helped refresh her recollection as to what happened that day. She continued to deny any memory of the events that night.

### G.   Savannah's trial testimony

At trial, Savannah described Juanita as a family friend. On the night in question, Savannah was home with Angel. She denied seeing either Juanita or [petitioner] that night. She could not recall an incident occurring that night at her residence involving [petitioner] or Juanita. She claimed an inability to recall any statements she made to law enforcement about the incident that night.

## II.   Defense Evidence

Cristina Espiritu, a defense investigator, spoke to Juanita. Espiritu relayed the following information from Juanita to the jury. Juanita claimed that the police report was inaccurate and [petitioner] never threatened her. On the day in question, Juanita offered to give [petitioner] a ride and they visited a cemetery. They drank together and smoked marijuana. They became very emotional and they began driving around. During the drive they had an argument and they ended up at a friend's house. She was mad at him and she decided to stay with her friend. She threw her keys at him and told him to get away from her. She also gave him her cell phone.

Savannah and Angel were not outside the residence when Juanita and [petitioner] arrived. After [petitioner] left, Juanita wanted her vehicle back so she called law enforcement believing that was the fastest way to obtain it. She told police she wanted her car back and she did not want [petitioner] having any contact with her son. She told the officer that she was drunk. She said she was "pretty frantic" on the 911 call and she was "all over the place" so she had her friend finish the call.

Juanita spoke with the district attorney assigned to the case, explaining she had been drunk and she wanted to talk about the situation. The prosecuting attorney did not take the time to speak with her. She made another attempt to speak with a second prosecuting attorney. She refused to testify because "the whole situation was blown out of proportion" and [petitioner's] potential

6

prison sentence was inappropriate "for a misunderstanding."

ECF No. 12-2 at 2-8 (footnotes in original).

On direct appeal, the California Court of Appeal rejected petitioner's Confrontation Clause claim and affirmed his conviction. ECF No. 12-2. The California Supreme Court summarily denied review. ECF No. 12-4. Accordingly, petitioner's claim has been exhausted before the state courts.

**II.     Discussion**

**a.     Standard of Review**

A federal court can grant habeas relief when a petitioner shows that his custody violates federal law.[5]  *See* 28 U.S.C. §§ 2241(a), (c)(3), 2254(a); *Williams v. Taylor*, 529 U.S. 362, 374-75 (2000). Section 2254 of Title 28, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), governs a state prisoner's habeas petition. *See Harrington v. Richter*, 562 U.S. 86, 97 (2011). To decide a § 2254 petition, a federal court examines the decision of the last state court to have issued a reasoned opinion on petitioner's habeas claims. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). In general, § 2254 requires deference to the state court system that produced the petitioner's conviction and sentence.

Under AEDPA, a petitioner can obtain relief on federal habeas claims that have been "adjudicated on the merits in state court proceedings" only if the state court's adjudication resulted in a decision (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The petitioner's burden is great. *See Richter*, 562 U.S. at 103 ("[To gain relief under § 2254(d)(1), a petitioner] must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."); *see Davis v. Ayala*, 576 U.S. 257, 271

---

[5] This court has jurisdiction over the petition pursuant to 28 U.S.C. § 2241(a): "Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions."

(2015) (quoting § 2254(e)(1)) (Under § 2254(d)(2), "[s]tate-court factual findings . . . are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'").

If obtaining habeas relief under § 2254 is difficult, "that is because it was meant to be." *Richter*, 562 U.S. at 102.  As the Supreme Court has put it, federal habeas review "disturbs the State's significant interest in repose for concluded litigation, denies society the right to punish some admitted offenders, and intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority." *Id*. at 103 (citation omitted).  Our habeas review authority serves as a "guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id*. at 102-03 (emphasis added).

This court reviews the last reasoned opinion—in this case, that of the Court of Appeal. Because the Court of Appeal rejected petitioner's claims on the merits, the deferential standard of § 2254 applies.

    **b.**    **Alleged Confrontation Clause Violation**

Petitioner claims that the trial court violated his Sixth Amendment right to confrontation. ECF No. 1 at 14-16.  On direct appeal, he argued that Juanita's statements to a police officer, conveyed to the jury via the officer's testimony, violated his Confrontation Clause rights.  ECF No. 12-2 at 2.  The Court of Appeal rejected this claim, declining to analyze whether petitioner's confrontation rights were violated.  Instead, relying on the harmless error standard of *Chapman v. California*, 386 U.S. 18, 24 (1967), the Court of Appeal stated that petitioner's "constitutional challenge under *Crawford* can be resolved without analyzing the actual constitutional issue if any assumed error was harmless beyond a reasonable doubt." *Id.* (citing *Crawford v. Washington*, 541 U.S. 36 (2004)).  The appellate court stated that it "need not resolve the parties' complex dispute," and instead found that any constitutional error was harmless because the evidence at trial "overwhelmingly establishe[d]" petitioner's guilt.  *Id*.  Because the Court of Appeal analyzed petitioner's claim under a *Chapman* harmless error analysis, and this claim was adjudicated on the merits for purposes of federal habeas review, AEDPA's highly deferential standard applies.  *See Davis v. Ayala*, 576 U.S. 257, 269 (2015); *Mitchell* v. *Esparza*,

8

540 U.S. 12, 17-18 (2003) (per curiam).  Under this standard, we ask whether the Court of Appeal applied *Chapman* in an "objectively unreasonable" manner, *see Lockyer v. Andrade*, 538 U.S. 63, 75 (2003), meaning we ask whether the "*harmlessness determination itself* was unreasonable," *Fry v. Pliler*, 551 U.S. 112, 119 (2007) (emphasis in original).  To meet this standard, petitioner must show that the state court's decision to reject his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

The Court of Appeal recounted the trial evidence as follows:

> The jury heard the three 911 calls from the day in question.  From these recordings, the jury learned that [petitioner] used Juanita's cell phone to call Angel.  He threatened Juanita and held her hostage while they drove around together in her car.
>
> [Petitioner] demanded money, which Angel gave to him.  Juanita could be heard crying.  She said she was "scared" of [petitioner] and "traumatized by him."  [Petitioner] took Juanita's Lexus, which Juanita wanted back.
>
> Deputies responded and took statements from Angel and Savannah.  These statements were consistent with the 911 calls.  Both Angel and Savannah said [petitioner] called Angel using Juanita's cell phone.  [Petitioner] and Juanita arrived at Angel's residence in Juanita's Lexus.  Angel saw [petitioner] with two firearms, and he pointed one of them at Juanita.  Savannah could hear [petitioner] "screaming and she heard him mention a firearm."  Both Angel and Savannah stated that [petitioner] demanded money from Angel, who gave him $40.  [Petitioner] took Juanita's keys and he left in her Lexus.
>
> Later that day, [petitioner] fled from officers and he was arrested after he crashed the Lexus in an orchard.  [Petitioner] refused repeated commands to come down from a tree. After he was taken into custody, $40 and Juanita's cell phone were located on him.

ECF No. 12-2 at 12.

The Court of Appeal then considered and rejected petitioner's contention that the evidence presented at trial was not overwhelming,[6] finding that because "Angel and Savannah's trial testimony lacked any credibility" and that petitioner's guilt was "overwhelmingly established

---

[6] The Court of Appeal characterized petitioner's arguments as follows: "(1) Angel testified at trial that she denied approaching the vehicle; (2) Savannah testified at trial that she did not see [petitioner]; and (3) no 'corroborating firearms were found.'" *Id.*

9

by the remaining evidence," it was "beyond a reasonable doubt [that] the admission of Juanita's statements at trial did not contribute to this verdict." *Id.* at 13.

In light of the evidence presented at trial, it was reasonable for the Court of Appeal to find that the admission of Juanita's statements at trial was harmless. Juanita's statements to the officer were redundant; ample evidence supported the convictions in question. For example, the jury heard three 911 calls—two from Juanita[7]—as well as descriptions of the statements made by Angel and Savannah. The calls and statements were made to the authorities while the incident was ongoing, belying a motive to fabricate. *See Michigan v. Bryant*, 562 U.S. 344, 361 (2011) (stating that "the prospect of fabrication in statements given for the primary purpose of resolving [an] emergency is presumably significantly diminished"). The police officer also testified to his own observations about Juanita's demeanor when he arrived on the scene, stating that she was distressed and crying. ECF No. 12-2 at 3. Petitioner was apprehended—after a high-speed chase—in Juanita's vehicle. Petitioner was found with $40 cash; all three eyewitnesses described petitioner as having taken that amount. Juanita's cell phone was found on petitioner.

Petitioner has failed to show that the appellate court's harmless error finding "was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. On the contrary, the finding was reasonable. Therefore, petitioner's claim should be denied.[8]

---

[7] In an evidentiary hearing, the trial court ruled that Juanita's 911 calls and her interview statements were admissible. ECF No. 21-9 at 118-26. The trial court found that the calls and statements were not subject to the Confrontation Clause because they were made during an ongoing emergency and not for the primary purpose of criminal prosecution. *Id.* On direct appeal, petitioner only challenged the admissibility of Juanita's interview statements; he did not challenge the admissibility of Juanita's 911 calls. *See generally* ECF No. 21-1.

[8] Even if we were to reach the merits of petitioner's Confrontation Clause claim—which was not warranted in the Court of Appeal and is not warranted here—it would not guarantee relief. Statements "made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency" are not testimonial in nature and are therefore not subject to the Confrontation Clause. *Davis v. Washington*, 547 U.S. 813, 821-23 (2006). While we do not decide the question (and do not need to decide it), we note that there is at least a colorable argument that the statements in question—apparently offered while the witness was distressed and petitioner was

1       **c. Motion for Evidentiary Hearing**

2       Petitioner moves for an evidentiary hearing. ECF No. 1 at 18. But habeas petitioners have no right to evidentiary hearings; only under limited circumstances are such hearings granted. *See* 28 U.S.C. § 2254(e)(2)(A)(ii). A state prisoner seeking an evidentiary hearing must show that he "was not at fault in failing to develop that evidence in state court, or (if he was at fault) if the conditions prescribed by § 2254(e)(2) were met." *Holland v. Jackson*, 542 U.S. 649, 652-53 (2004). Under § 2254(e)(2), the petitioner must show that there is either a new, retroactive rule of constitutional law that was unavailable to him or a fact that he could not have discovered through the exercise of due diligence. 28 U.S.C. § 2254(e)(2)(A)(ii). Here, petitioner presented no arguments in support of his motion. Accordingly, he has failed to show he was not at fault for failing to develop the evidence in state court, or that his motion relies on a new, retroactive rule of constitutional law or a fact that he could not have discovered previously. Therefore, petitioner has failed to meet AEDPA's requirements for an evidentiary hearing, and we deny his request.

      **d. Motion for Counsel**

Petitioner moves for the appointment of counsel. ECF No. 1 at 18. Petitioner has made no arguments in support of his motion. A petitioner in a habeas proceeding does not have an absolute right to counsel. *See Anderson v. Heinze*, 258 F.2d 479, 481 (9th Cir. 1958). There are three specific circumstances in which appointment of counsel is required in habeas proceedings. First, appointment of counsel is required for an indigent person seeking to vacate or set aside a death sentence in post-conviction proceedings under 28 U.S.C §§ 2254 or 2255. *See* 18 U.S.C. § 3599(a)(2). Second, appointment of counsel is sometimes required if an evidentiary hearing is

---

still at large—were made under circumstances objectively indicating a need to resolve an ongoing emergency. *Compare* ECF No. 12-2 at 4 *with* id. at 6 (suggesting that the deputy was speaking to a distressed Juanita while petitioner was still leading officers "on an unsafe, high-speed pursuit"); *see also, e.g.*, *United States v. Gomez*, 472 F. App'x 601, 603 (9th Cir. 2012) (finding that admission of statements "aimed at soliciting information on [a victim's] condition, providing directions on how to help her, and identifying the name and possible location of the assailant" were nontestimonial, and thus not subject to the Confrontation Clause); ECF No. 21-2 at 23-34 (briefing this issue before the California Court of Appeal).

1  warranted. *See* Rules Governing § 2254 Cases 8(c). Third, appointment of counsel is sometimes
2  necessary for effective discovery. *See id*. at 6(a). None of these situations is present here.

3        We are further authorized to appoint counsel for an indigent petitioner in a habeas corpus
4  proceeding if we determine that the interests of justice require the assistance of counsel. *See*
5  *Chaney v. Lewis*, 801 F.2d 1191, 1196 (9th Cir. 1986); 18 U.S.C. § 3006A(a)(2)(B). However,
6  "[i]ndigent state prisoners applying for habeas corpus relief are not entitled to appointed counsel
7  unless the circumstances of a particular case indicate that appointed counsel is necessary to
8  prevent due process violations." *Chaney*, 801 F.2d at 1196. In assessing whether to appoint
9  counsel, we evaluate the petitioner's likelihood of success on the merits as well as the ability of
10 the petitioner to articulate his claims without counsel, considering the complexity of the legal
11 issues involved. *See Weygandt v. Look*, 718 F.2d 952, 954 (9th Cir. 1983). Petitioner stated a
12 cognizable habeas claim and we have determined that his claim is meritless. Accordingly, we
13 cannot conclude that the interests of justice require us to appoint counsel for petitioner.

14 **III.   Certificate of Appealability**

15       A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district
16 court's denial of a petition; he may appeal only in limited circumstances. *See* 28 U.S.C. § 2253;
17 *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). Rule 11 Governing § 2254 Cases requires a
18 district court to issue or deny a certificate of appealability when entering a final order adverse to a
19 petitioner. *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th
20 Cir. 1997). A certificate of appealability will not issue unless a petitioner makes "a substantial
21 showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This standard requires
22 the petitioner to show that "jurists of reason could disagree with the district court's resolution of
23 his constitutional claims or that jurists could conclude the issues presented are adequate to
24 deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *accord Slack v.*
25 *McDaniel*, 529 U.S. 473, 484 (2000). Here, petitioner has not made a substantial showing of the

denial of a constitutional right.  Thus, we recommend that the court not issue a certificate of appealability.

**IV.     Findings and Recommendations**

We recommend that the court deny the petition for a writ of habeas corpus, ECF No. 1, and decline to issue a certificate of appealability.  These findings and recommendations are submitted to the U.S. District Court judge presiding over this case under 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty days of the service of the findings and recommendations, petitioner may file written objections to the findings and recommendations with the court and serve a copy on all parties.  That document must be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The district judge will then review the findings and recommendations under 28 U.S.C. § 636(b)(1)(C).

**V.     Order**

Petitioner's motions for an evidentiary hearing and the appointment of counsel are denied.  ECF No. 1 at 18.

IT IS SO ORDERED.

Dated:     September 30, 2020                      _____
                                                    UNITED STATES MAGISTRATE JUDGE

No. 206.

13